# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State of West Virginia ex rel. Jane Doe-1 et al.,**
**Petitioners**

**FILED**
**June 16, 2015**
released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**vs) No. 15-0029 (Berkeley County 13-C-656)**

**The Honorable Gray Silver III, Judge of the Circuit Court of Berkeley County; Corporation of the President of the Church of Jesus Christ of Latter-Day Saints; Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints; Steven Grow; Donald Fishel; Christopher Jensen; Sandralee Jensen; Unnamed Defendant-1; and Kirk H. Bottner,**
**Respondents**

## MEMORANDUM DECISION

In this original proceeding, the petitioners and plaintiffs below, twelve children and eleven parents from six families, by counsel Robert P. Fitzsimmons, Brent E. Wear, Justin J. Wiater and Carl F. Kravitz, petition to prohibit the circuit court from enforcing its order of December 9, 2014. The circuit court's order adopted the recommended order and report of the discovery commissioner that the guardian ad litem appointed for incarcerated defendant Michael Jensen should continue to serve, in effect, as Jensen's attorney ad litem. The order also required that the plaintiffs bear one-half of the costs associated with that appointment. The respondents, defendants below, Corporation of the President of the Church of Jesus Christ, Corporation of Presiding Bishop of the Church of Jesus Christ of Latter-day Saints, Steven Grow, and Donald Fishel, by counsel William J. Powell and Alan E. Kraus, respondents Christopher Jensen and Sandralee Jensen, by counsel John J. Polak, Unnamed Defendant-1, a respondent, by counsel Joseph R. Ferretti, and respondent Kirk H. Bottner, appearing pro se, ask this Court to deny the writ.

This Court has considered the parties' briefs, oral argument, and the record on appeal. Upon our consideration of the applicable standards of review and the record presented, we conclude that the circuit court's December 9, 2014, order is clearly erroneous as a matter of law and that the requested writ of prohibition should be moulded and granted. Because this Court finds no substantial question of law, a memorandum decision granting and moulding the requested extraordinary writ is appropriate under Rule 21 of the West Virginia Rules of Appellate Procedure.

1

## Factual and Procedural Background

Jensen was convicted by a jury in February 2013 of three sex offenses against two brothers—aged three and four—that occurred in 2007, when Jensen was sixteen years old. On appeal, we affirmed Jensen's convictions, *see State v. Jensen*, No. 13-1088, 2014 WL 2681229 (W. Va. June 13, 2014), for which he was sentenced as an adult to an aggregate term of imprisonment of thirty-five to seventy-five years. Jensen, his parents, his victims, and his victims' parents all belonged to the Church of Jesus Christ of Latter-day Saints (the "Church"), within which they were members of the Martinsburg Stake. In the Church, a stake is a geographically homogenous group of wards, or local congregations.

On September 16, 2013, the two victims in the criminal proceedings, their parents, and five other families in the Martinsburg Stake filed under seal a civil action against Jensen, Jensen's parents, the Church, a pair of corporate Church entities,[1] the Stake President, and the Bishop of the Hedgesville Ward. The plaintiffs alleged therein that Jensen had sexually abused as many as twelve children, and that, on several occasions, another child had been forced to watch his younger brother be abused by Jensen. Thereafter, the parties entered into a stipulation dismissing the Church, an unincorporated association, without prejudice. The operative Amended Complaint of February 4, 2014, retained the initial defendants other than the Church, and it added another, unnamed defendant who was formerly a member of the Martinsburg Stake. The Amended Complaint asserts myriad claims for, inter alia, negligence, fraud, intentional infliction of emotional distress, and civil conspiracy, all stemming from the Stake's and the Church's purported indifference to and complicity in Jensen's sexual predations. The plaintiffs seek compensatory and punitive damages.

A few weeks after litigation commenced, the plaintiffs moved the circuit court to appoint a guardian ad litem for Jensen, so that he could be legally served with process.[2]

---

[1] Specifically, the corporate entities defending the interests of the national Church are the Corporation of the President of the Church of Jesus Christ of Latter-day Saints and the Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints.

[2] West Virginia Rule of Civil Procedure 4(d)(4) provides for service on incarcerated convicts "by delivering a copy of the summons and complaint to that person's committee, guardian, or like fiduciary resident in the State." The committee referred to in Rule 4(d)(4) is a person appointed by a county commission on the motion of an interested party who may take possession of and manage a convict's estate, real and personal, "until the convict is discharged from confinement or dies." W. Va. Code § 28-5-33 (1982).

(continued. . .)

A guardian is generally appointed by a court of law to exercise domain over the affairs of an incompetent or incapacitated person, depending on the specific grant of authority.[3] At the extremes, a court may designate a guardian as the incompetent's legal surrogate for all purposes, or it may limit a guardian to stand in for the incompetent in particular litigation by appointing him or her *ad litem*, that is, for the suit. *See* Black's Law Dictionary 725 (8th ed. 2004) (noting that a guardian "ad litem" is appointed by a court for the express purpose of "appear[ing] in a lawsuit"). In West Virginia, a guardian ad litem is required to be "a discreet and competent attorney at law." W. Va. R. Civ. P. 17(c).

The circuit court entered an order on October 31, 2013, appointing attorney Kirk Bottner as Jensen's guardian ad litem "for the purpose of service of process and for such other purposes as contemplated by the Rules of Civil Procedure." The order also set forth the circuit judge's handwritten addendum that "[t]he Plaintiffs agree to pay the reasonable attorney fees and expenses of the Guardian ad litem subject to other individuals or entities being ordered to do so by the Court." Service on Jensen was thereby perfected by delivery of process to Mr. Bottner, the culmination of which appears to have terminated the latter's appointment in the eyes of the parties. But not long thereafter, on January 23, 2014, the corporate Church entities and the Stake and Ward officials moved to once again appoint Mr. Bottner to "represent the interests" of Jensen as guardian ad litem.

In their motion, the four moving defendants explained that the plaintiffs had served notice of Jensen's deposition, evidencing the plaintiffs' intent to continue the suit against him and necessitating the protections provided by law. The moving defendants cited our decision in *Craigo v. Marshall*, 175 W. Va. 72, 331 S.E.2d 510 (1985), in syllabus point 2 of which we held that, absent an express written waiver of the right to a committee or a guardian ad litem, a lawsuit cannot be directly maintained against an incarcerated convict. *Accord* syl. pt. 1, *State ex rel. Lawson v. Wilkes*, 202 W. Va. 34, 501 S.E.2d 470 (1998); *see also* W. Va. R. Civ. P. 55(b)(2) (barring default judgments against convicts and other incompetents absent an appearance on the defendant's behalf "by a guardian, guardian ad litem, committee, conservator, curator, or other representative").

---

[3] *See, e.g.*, *Matter of Estate of Kutchins*, 523 N.E.2d 1025, 1028 (Ct. App. Ill. 1988) (observing one purpose of appointing a guardian "is to protect [an] incompetent from personally wasting his estate or allowing others to do so," and instructing that no one else may act generally on the incompetent's behalf "without express authority or appointment").

3

In response to the motion, the plaintiffs agreed that a guardian ad litem should be appointed "for the limited purposes of accepting service and notices" and to protect Jensen's "interests in this civil action to the extent events here bear on or impact his criminal case." The plaintiffs conditioned their approval, however, on the appointee performing the "normal" functions expected of a guardian ad litem, "as opposed to being appointed as defense counsel for . . . Jensen in this civil action," and on not being held liable for any costs thereby incurred. In that vein, the plaintiffs rejected the moving defendants' proposal that the opposing sides bear equal responsibility for the compensation paid the guardian ad litem.

The circuit court entered an order on February 27, 2014, granting the motion and reappointing Mr. Bottner as guardian ad litem. In so doing, the court found that both sides "desire the appointment of a Guardian ad Litem; that [otherwise] Michael Jensen would be deemed incompetent; and his best interest and the best interests of all parties would not be served." The circuit court acknowledged the lack of consensus on compensation, reciting that the parties had requested to proceed in accordance with the West Virginia Trial Court Rules, which, under certain conditions, provide for payment of a guardian ad litem from Supreme Court funds. *See* T.C.R. 21.05(c) (authorizing Court to pay for guardian ad litem appointed on behalf of "an incarcerated person who is indigent"). Although Trial Court Rule 21.06 clearly sets forth the procedure for requesting payment from the Supreme Court, *i.e.*, "on forms provided by the Administrative Director of the Court," the circuit court expressed its belief that it was without authority to proceed in that fashion. The circuit court thus appointed Mr. Bottner "for the purpose of representing [Jensen's] interests in this civil action to allow this matter to proceed." The order directed that Mr. Bottner submit his invoices to the circuit court "for review of reasonableness, [with] the payment thereof, if not agreed to by the parties, to be resolved by a subsequent Order of this Court."

Shortly after his appointment, Mr. Bottner attended the depositions of Jensen's trial counsel and of Jensen himself. The latter took place in April 2014 at Mount Olive Correctional Complex in Fayette County, during the pendency of Jensen's appeal in his criminal proceeding. There, Mr. Bottner instructed Jensen not to answer certain questions posed by plaintiffs' counsel on the ground that he might incriminate himself. On July 18, 2014, Mr. Bottner filed a motion to quash a subpoena served on a State Police corporal who had been involved in the criminal investigation. The corporal, prompted by counsel for the plaintiffs, had acquired Jensen's juvenile records in Utah, which included the details of Jensen's 2005 guilty plea to two counts of lewdness involving a child. After the records had been produced, Mr. Bottner moved for a protective order to avoid having Jensen respond to requests for admissions relating to the Utah offenses. On August 7, 2014, Mr. Bottner attended the corporal's deposition and that of a State Police colleague who had also been assigned to the Jensen investigation.

4

On September 30, 2014, the plaintiffs filed a "Motion to Limit and Define the Role" of Mr. Bottner, seeking further to strike Jensen's yet-pending motions to quash and for a protective order. All three motions came on for hearing before the court-appointed discovery commissioner on October 2, 2014. The commissioner indicated at the hearing that he had discussed the motions with the circuit judge, and, noting that no committee had yet been appointed, he conveyed the court's thinking:

> [I]t is anticipated that there will be an application to have [a] committee appointed within a period of three months prior to any abatement by the Court of this civil action, because we really don't want it abated. But in the interim, the guardian ad litem shall continue in full capacity as he has been until such time as . . . a committee can be appointed.

> The legal obligation of the committee at that point in time is to marshal the assets of the convict, which I would anticipate are going to be zero. But in any event, either side is free to then make application to the committee for reimbursement.

> The Judge was anticipating that until such time as a committee gets appointed . . . that Mr. Bottner's expenses ought to be divided equally between the plaintiff side and the defense side. In fact, he was anticipating that Mr. Bottner might be in a position where he probably . . . ought to be sending out an interim bill to try to get some compensation from somebody. . . . [A]t the present Mr. Bottner is going to have to continue in his capacity because the Judge feels that that's necessary as an alternative to abating this matter.

The plaintiffs voiced objections to the ruling, in response to which the commissioner opined, "The difficulty is . . . the plaintiffs elected to proceed with the direct action against a convict without securing a committee. . . . And the Court is now faced with the prospect of trying to cover that in the interim without having to invoke the abatement process." The commissioner thereafter denied Jensen's motion to quash as moot, and he declined to rule on the motion for a protective order. The commissioner noted that, if Jensen refused to answer the requests for admissions, the circuit court could determine at trial whether the refusals would have any probative significance.

By his recommended order and report of November 10, 2014, the discovery commissioner memorialized in writing his oral rulings, which, by its order of December 9, 2014, the circuit court summarily adopted in full over the plaintiffs' exceptions. Mr. Bottner subsequently submitted an invoice to the parties for fees and expenses from February 26, 2014, through December 19, 2014. The invoice contained over 700 billable entries, totaling $46,800.58. Of that amount, $44,075.00 was billed for 176.3 hours of

attorney fees at $250/hour, plus $2,725.58 for mileage, travel, and office expenses.  On January 13, 2015, the plaintiffs filed the instant petition seeking Mr. Bottner's removal and to prohibit enforcement of the December 9 order insofar as it purports to hold them liable for one-half of the submitted fees and costs.

## Standard of Review

We will grant a petition seeking a writ of prohibition "'only to restrain inferior courts from proceedings in causes over which they have no jurisdiction, or, in which, having jurisdiction, they are exceeding their legitimate powers.'"  Syl. pt. 3, in part, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1996) (quoting syl. pt. 1, in part, *Crawford v. Taylor*, 138 W. Va. 207, 75 S.E.2d 370 (1953)).  A petition for a writ of prohibition "'may not be used as a substitute for a petition for appeal or certiorari.'"  *Id.* (quoting *Crawford*) (alteration omitted).  In *Hoover*, we set forth five factors to assist us in determining whether a lower tribunal has exceeded its legitimate authority such that we should exercise our discretion to grant extraordinary relief in prohibition:

> (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression.  These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue.  Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

Syl. pt. 4, in part, *id.*

## Analysis

We observe that the first two *Hoover* factors are satisfied.  The circuit court has imposed on the plaintiffs more than $23,000 in fees and costs that are expected to be paid sooner rather than later.  In addition, it seems certain that the plaintiffs' obligations under the circuit court's order will increase, perhaps substantially, before any appeal in the underlying matter may ripen.  If there be error in the circuit court's rulings, either in the appointment of Mr. Bottner or in allocating the responsibility for his compensation, then postponing the correction of the error is likely to prove exceedingly problematic and inconvenient for the parties.  For example, monies paid to Mr. Bottner by the plaintiffs may have to be disgorged, with insufficient assurance at the conclusion of a prolonged

6

trial and appellate process that such disgorgement would smoothly succeed or that substitute recompense would follow immediately. Deferring our consideration of the matter until appeal therefore poses an unacceptable risk of the eventual remedy proving inadequate, such that the plaintiffs suffer damage or prejudice of a kind not readily susceptible to amelioration.

Moreover, the circuit court's order is clearly erroneous in two ways: First, it requires Mr. Bottner to perform legal services that are not contemplated by our law, and second, it orders the plaintiffs to shoulder a portion of Mr. Bottner's fees and costs.

We begin by pointing out the obvious, that is, by recognizing that our enactments requiring the appointment of a litigation proxy for an incompetent derive from traditional due process concepts of notice and fairness. As prescribed by our federal and State constitutions, the fundamental right of due process exists to protect persons against arbitrary divestitures of life, liberty, or property. U.S. Const. amend. XIV, § 1 (providing that no state shall "deprive any person of life, liberty, or property, without due process of law"); W. Va. Const. art. III, § 10 ("No person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers."). The essential purpose of a civil action in which a money judgment is demanded is to deprive, insofar as may be possible, the defendant of his property in an amount equivalent to the judgment. Threshold protections commensurate with due process must therefore apply, even in the case of an indigent convict with meager property and poor prospects for acquiring more.

The requisite protections, however, rise to nowhere near the level of appointing counsel to defend the civil lawsuit without charge to the convict. *See Craigo v. Hey*, 176 W. Va. 514, 518–19, 345 S.E.2d 814, 818–19 (1986) (confirming that prisoners have no right to defense counsel in an ordinary civil action, outside of traditional exceptions such as proceedings involving divorce, termination of parental rights, determination of paternity, or adjudication of insanity), *overruled on other grounds by State ex rel. Deblasio v. Jackson*, 227 W. Va. 206, 707 S.E.2d 33 (2011). A convict with sufficient resources and motivation to defend the asserted claims is entitled to hire legal representation, or he or any interested party may cause the county commission to appoint a committee, whom would thereby be empowered to retain counsel on behalf of the convict.

Frequently, a convict will lack the necessary assets to obtain the services of a paid committee or to hire an attorney. In such an instance, the county sheriff may be appointed as committee. *See* W. Va. Code § 28-5-34 (1903). Among the sheriff's duties as committee are to appraise and account for the convict's estate, *see id.* § 28-5-35, and to "prosecute or defend" lawsuits as a placeholder for the convict, *id.* § 28-5-36. By fulfilling those duties and responsibilities, the county sheriff affords the constitutional modicum of process due an indigent convict.

7

There is no reason to believe that, in a similar situation, the duties of a duly appointed guardian ad litem should be radically different from those thrust upon a committee. Although service as a guardian ad litem is restricted to attorneys, it is clear that Trial Court Rule 21, detailing the position's appointment and compensation, is not intended as a boon for lawyers. To qualify for payment from Supreme Court funds, a guardian ad litem must be appointed on behalf of an incompetent who is indigent. *See* T.C.R. 21.05. Compensation is paid at $100 per hour for time spent in court and $80 per hour otherwise, capped at $3000 except as may be approved by the Court in an exceptional case. *See id.* 21.06.[4] Such rate and cap parameters in no way suggest that the proper role of a guardian ad litem is to provide full-blown legal representation. Instead, the Trial Court Rules instruct merely that "[a] guardian ad litem shall make a full and independent investigation of the facts involved in the proceeding and make recommendations to the court by testimony or in writing, unless otherwise ordered by the court." *Id.* 21.03.

By attending discovery depositions, instructing Jensen not to answer questions under oath, and sponsoring motions in opposition to the plaintiffs' attempts to gather evidence, Mr. Bottner assumed a role as Jensen's legal representative far beyond the modest duties expected of a guardian ad litem. In that regard, Mr. Bottner acted as Jensen's attorney ad litem.[5] West Virginia does not provide for the appointment of an

---

[4] A guardian ad litem may also serve on a voluntary basis, or may receive payment from a litigant with sufficient funds. *See* T.C.R. 21.02(a)–(b). In the latter instance, of course, compensation may be paid in excess of the public rate. The extensive revisions to Trial Court Rule 21 in 2005 amended the law as set forth in *Quesinberry v. Quesinberry*, 191 W. Va. 65, 443 S.E.2d 222 (1994). At the time of our *Quesinberry* decision, there existed "neither a valid statute nor an appropriation for an expenditure providing compensation to a lawyer appointed as a guardian *ad litem* for an incarcerated convict named as a defendant in a civil action." 191 W. Va. at 69, 443 S.E.2d at 226. We thus concluded that the circuit court in that case lacked the authority to direct the Administrative Director to pay guardian ad litem fees.

[5] The distinction between a guardian ad litem and an attorney ad litem has been explained thusly:

> The role of the guardian *ad litem* . . . should be . . . to protect the child's interest and to gather and present facts for the court's consideration. The role of the attorney *ad litem,* however, should be that of any other attorney—to represent and advocate the child's interests before the court, including the calling and cross-examining of witnesses, etc. The guardian *ad litem* may testify; the attorney *ad litem* should not. The guardian *ad*

(continued. . .)

8

attorney ad litem to represent an incarcerated convict in a civil proceeding. Mr. Bottner's performance of duties attendant to the position of attorney ad litem was therefore manifestly in derogation of State law. By ordering that Mr. Bottner continue to effectively serve as Jensen's attorney ad litem, the circuit court's order of December 9, 2014, is clearly erroneous as a matter of law.

Furthermore, we recognize that Mr. Bottner was appointed at the moving defendants' instance over the objection of the plaintiffs, who, bearing the brunt of his unauthorized advocacy, continued to resist his appointment through motion, and ultimately, initiated this proceeding resulting in his discharge. Under the circumstances, it would be inequitable to hold the plaintiffs responsible for any portion of Mr. Bottner's compensation for services performed after his appointment by the circuit court's order of February 27, 2014.[6] *See Quesinberry v. Quesinberry*, 191 W. Va. 65, 69 n.2, 443 S.E.2d 222, 226 n.2 (1994) ("Thus, when [a] . . . well-financed litigant crossclaims, counterclaims, or otherwise joins an indigent to a lawsuit, the trial court has discretion to require the party creating the problem that compels appointment of a guardian *ad litem* to pay for such a guardian."). That burden shall instead fall upon the moving defendants, subject to the circuit court's approval of Mr. Bottner's invoices using the same evaluative criteria as any award of attorney fees.

## Conclusion

While the appointment of Mr. Bottner as guardian ad litem did not constitute clear error, the circuit court's order of December 9, 2014, insofar as it effectively appointed Mr. Bottner as Jensen's attorney ad litem, was clearly erroneous as a matter of law. Mr. Bottner is therefore discharged from his effective appointment as attorney ad litem in the

---

*litem* is guided by the child's best interest, irrespective of the child's wishes; the attorney *ad litem* should advocate the wishes of the client.

*Potter v. Paterson*, No. E2013–01569–COA–R3–CV, 2014 WL 2442776 at *4 (Tenn. Ct. App. May 28, 2014) (unpublished) (citation and internal quotation marks omitted). Texas takes a similar view. *See City of Houston v. Woods*, 138 S.W.3d 574, 582 (Tex. App. 2004) (explaining that "[a] guardian ad litem is not an attorney for the child, but an officer appointed by the court to assist in properly protecting the child's interests. An attorney ad litem, on the other hand, performs the same services as any other attorney—giving advice, doing research, and conducting litigation" (citations omitted)).

[6] The record does not reflect that Mr. Bottner currently seeks payment for services rendered prior to his appointment by the circuit court's order of February 27, 2014.

9

underlying civil action.[7] Additionally, the circuit court is prohibited from enforcing its order insofar as it purports to impose any liability on the plaintiffs for Mr. Bottner's fees and costs in the service of Jensen.

Writ granted as moulded.

**ISSUED: June 16, 2015**


**CONCURRED IN BY:**
Justice Robin Jean Davis
Justice Brent D. Benjamin
Justice Menis E. Ketchum

**CONCURRING AND WRITING SEPARATELY:** Justice Allen H. Loughry II; joined by Chief Justice Margaret L. Workman


The majority's conclusion that the circuit court "inequitably" required the plaintiffs to pay the guardian ad litem fees incurred in defense of their accused molester may be one of the more remarkable understatements offered by this Court. I cannot fathom how the circuit court justified requiring the plaintiffs to contribute to their alleged, and for some, convicted, molester's defense. There is no question that the apportionment of fees was error. Moreover, this error was heavily exacerbated by the circuit court's abject failure to define the proper scope of the guardian ad litem's duties. It is on this issue that I write separately to ensure that our circuit courts are not haphazardly enabling defenses for every incarcerated criminal who demands a defense attorney in a civil matter, where a defense is meritless or pointless, or access to the courts is otherwise available.

Importantly, the appointment of a guardian ad litem for an incarcerated person is *not* an automatic right:

> Pursuant to W.V.R.C.P., Rule 17(c) [1978], the appointment of a guardian *ad litem* for an incarcerated convict in a civil action *is not mandatory if the court can reasonably order another appropriate remedy* while the convict remains under the legal disability of incarceration.

---

[7] Pursuant to W. Va. Code §§ 28-5-33 to -36, we expect that Jensen or an interested party to this matter will seek the appointment of a committee to represent Jensen's interests as an incarcerated defendant in this civil litigation.

> There are several alternatives to appointment of a guardian *ad litem* for indigent incarcerated defendants.

Syl. Pt. 2, in part, *Quesinberry v. Quesinberry*, 191 W.Va. 65, 443 S.E.2d 222 (1994) (emphasis added). Through this syllabus point, the Court explains that a continuance, if feasible, is a reasonable alternative to the appointment of a guardian ad litem that should be considered. More importantly, however, *Quesinberry* mandates that the circuit court utilize its discretion to determine the necessity of even appointing a guardian ad litem. Syllabus point two further provides that "the court should determine whether a guardian *ad litem* is essential for the protection of the incarcerated defendant's rights under the particular circumstances of the pending action." *Id.* This syllabus point then directs the circuit court to examine whether the prisoner is contesting the suit or if an adverse judgment would "affect any present or future property rights" of the prisoner. *Id.* Accordingly, before appointing a guardian ad litem to an incarcerated person, the circuit court must examine, among other things, 1) the nature of the prisoner's proposed defense, 2) the merits thereof, and 3) the resulting deprivation if the defense is unsuccessful.

Regarding the guardian ad litem's duties after appointment, Trial Court Rule 21.03, entitled "Duties *Generally*," provides that "[a] guardian ad litem shall make a full and independent investigation of the facts involved in the proceeding and make recommendations to the court by testimony or in writing, *unless otherwise ordered by the court*." (emphasis added). Because the lower court neither defined the scope of the guardian ad litem's duties nor established who would pay for his services at the outset, it permitted the guardian ad litem to essentially write himself a blank check for a seemingly unlimited defense. The extensive time and fees that were being incurred clearly indicated the need for a further order pursuant to the "unless otherwise ordered" provision in Trial Court Rule 21.03. The duties described in this Rule more aptly apply to the appointment of a guardian ad litem in summary proceedings, requiring a defined area of investigation and reporting to the court. However, in this instance, where a guardian ad litem is appointed for an incarcerated person, it is plain that the discretionary language in Rule 21.03 becomes operative and the court must "otherwise order[]" the scope of the duties of the guardian ad litem.

It is on this particular point that I do take issue with the majority's suggestion that there is a defined scope of duties for guardian ad litem that exists in every case, which falls somewhere short of full-blown representation and hovers somewhere around the duties of a committee. *See* W.Va. Code §§28-5-33 to -36 (2013). This is not only at odds with the discretion created by *Quesinberry* and Trial Court Rule 21.03, but is completely unsupported and impractical. As noted above, the circuit court's careful guidance and strict parameters at the outset of a guardian ad litem appointment provide checks and balances on the guardian ad litem and the fees incurred. Nowhere does the majority memorandum decision adequately explain the defined duties of a guardian ad litem despite vaguely referring to "[t]he proper role of a guardian ad litem" and stating that Mr.

11

Bottner's services were "not contemplated by our law[.]" Further, it is the initial failing of the circuit court to define Mr. Bottner's duties in light of the defense being asserted by Mr. Jensen which created reversible error.

Accordingly, it would appear that upon request for the appointment of a guardian ad litem for an incarcerated person pursuant to Rule 17(c) of the West Virginia Rules of Civil Procedure and Rule 21 of the West Virginia Trial Court Rules, it is incumbent upon the trial court to examine the factors set forth in syllabus point two of *Quesinberry v. Quesinberry*, 191 W.Va. 65, 443 S.E.2d 222 (1994), to determine whether the appointment of a guardian ad litem is necessary. If the court determines that the appointment is appropriate, the trial court must, at the outset of the appointment, carefully and specifically define the scope of the guardian ad litem's duties, his or her hourly rate, and identify the source of the guardian ad litem's compensation.

That said, circuit courts must be mindful that to whatever extent due process requires minimal access to the court for an incarcerated person, it certainly does not create an unfettered right to appointed counsel as in the criminal realm. As explained by the Wisconsin Supreme Court: "Incarceration does not necessarily *mandate* the appointment of counsel. A prisoner who appears in circuit court to defend a civil tort action pro se should not have greater rights to appointed counsel than an indigent defendant who is not incarcerated." *Piper v. Popp,* 482 N.W.2d 353, 355 (Wis. 1992) (emphasis added). The *Piper* court, like this Court and others, noted that reasonable alternatives providing access are equally compliant with due process:

> A state court may avert depriving indigent incarcerated defendants in civil actions of the opportunity to defend themselves in a number of ways. These include, but are not limited to, postponing trial until the prisoner is released from incarceration, granting a continuance until the prisoner can retain counsel, allowing the prisoner to appear in circuit court pro se, or appointing counsel.

*Id.* The California Supreme Court has noted that reasonable alternatives for access must first be exhausted before counsel is appointed:

> In an appropriate case, and *as a last alternative*, appointment of counsel may be the only way to provide an incarcerated, indigent civil defendant with access to the courts for the protection of threatened personal and property rights. We again stress that *access—not the right to counsel—*is the keystone of the structure [governing appointment of counsel for incarcerated indigents][.]

12

*Yarbrough v. Superior Court*, 702 P.2d 583, 585 (Cal. 1985) (emphasis added). As the *Yarbrough* court emphasized, "access" to the courts is the guiding precept for consideration of a request for appointment of a guardian ad litem for an incarcerated person. This is entirely consistent with the construct this Court created in *Quesinberry* and the Trial Court Rules, which, if properly utilized, should ensure that situations such as this do not recur. In short, neither our caselaw nor our rules countenance granting incarcerated persons a free civil defense attorney at his or her whim.

Finally, I note that the majority memorandum decision disposes of this matter insofar as Mr. Bottner's duties are concerned by ruling that he is "discharged from his effective appointment as *attorney* ad litem in the underlying civil action" without further explanation or direction. (Emphasis added.). We assume this is meant to suggest that Mr. Bottner is to continue in his role as *guardian* ad litem, but should not function in same manner as he has previously. Obviously, in absence of any direction in the majority memorandum decision about the precise role of a guardian ad litem and, more importantly, the majority's refusal to incorporate the directives contained in this concurrence, the circuit court and Mr. Bottner will be left with a great deal of uncertainty. As a matter of prudence, I would suggest to the circuit court that the precepts contained in this concurrence regarding the proper scope of a guardian ad litem's duties should be applied. On remand, I would recommend that the circuit court determine what remains to be accomplished in this action and what the guardian ad litem's necessary role in those matters will be, if any, and enter an order directing him accordingly. In such order, I would also recommend that the circuit court revisit the fee schedule previously set by Mr. Bottner and establish a new schedule that adheres to the directives herein regarding assessment of such fees.

Accordingly, I respectfully concur. I am authorized to state that Chief Justice Workman joins in this separate concurrence.